**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Paul Norton VAN HEE, a/k/a Paul N.
Van Hee, Jr., Defendant-Appellant.**

**No. 75–1865.**

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 18, 1975.
Decided Feb. 23, 1976.

---

is transporting it in interstate commerce, a car, knowing it to have been stolen. . . .

**13.** Joint Appendix at 55.

**14.** *Id.*

**15.** Appendix at 99.

F. Lee Bailey, Stewart T. Herrick, Boston, Mass., for defendant-appellant.

Ralph B. Guy, Jr., U. S. Atty., Robert D. Sharp, Detroit, Mich., for plaintiff-appellee.

Before CELEBREZZE, LIVELY and ENGEL, Circuit Judges.

LIVELY, Circuit Judge.

In this case one of three persons jointly indicted for conspiring to violate the Munitions Control Act, 22 U.S.C. § 1934, "and the rules and regulations duly promulgated thereunder . . ." was tried alone and found guilty by a jury. The indictment charged that the defendant and others conspired to export from the United States to Portugal certain technical data relating to a military armored amphibious vehicle without obtaining an export license or written approval from the State Department. It was also charged that the same persons, in furtherance of the alleged conspiracy, arranged for the transfer of a prototype vehicle from West Germany to Portugal by way of Spain. The purpose of the conspiracy as stated in the indictment was to make it possible to produce a military vehicle in Portugal similar to an American-made vehicle for which an export license had previously been cancelled.

Control over "the export and import of arms, ammunition, and implements of war, including technical data relating thereto . . ." is lodged in the President by 22 U.S.C. § 1934. Pursuant to this statute a number of regulations have been issued which control the import and export of implements of war. 22 C.F.R. §§ 121.01 et seq. (1966) sets forth the regulations which apply to this case.

Prior to the time of the alleged conspiracy the defendant Van Hee had been an overseas salesman for a Michigan corporation which produces an armored amphibious vehicle known as the Commando. In 1965 defendant's employer contracted to sell 50 Commando vehicles to Portugal and Van Hee obtained the required export license. However, Portugal declined to certify that the vehicles would be used only in metropolitan Portugal and the State Department revoked the export license. It was testified that Van Hee was personally advised of the revocation by a State Department official.

Thereafter Van Hee and the indicted co-conspirator Larson, who was chief engineer of the corporation which designed and produced the Commando vehicle, solicited a group of individuals to go to Portugal to assist the Portuguese in manufacturing a Commando-like vehicle. The persons so recruited had all been involved in the development or manufacture of the Commando in Michigan. Before leaving for Portugal Larson and two of the other technicians, Erickson and Jordan, made copies of a large number of blueprints of parts of the Commando without permission of their Michigan employer. These were taken to Portugal, though no license for the export of technical data had been obtained.

The third indicted conspirator was Major Botto, a Portuguese national who was in charge of the effort to build a Commando-type vehicle in Portugal. Major Botto had been involved in the aborted agreement for the purchase of 50 American-made vehicles. When Erickson arrived in Portugal with the blueprints he took them to the office of Major Botto. Subsequently, when a prototype Commando arrived in Portugal from Spain Major Botto was at the dock observing its unloading.

The evidence showed that following their arrival in Portugal the American "team" began construction of a plywood mock-up of a Commando-like vehicle. With the arrival of the prototype vehicle this project was abandoned in favor of the construction of an actual armored vehicle. The Portuguese-made vehicle was designated "Chamite." Though it was not an exact copy of the Commando, there was evidence that the essential features of the Chamite were the same. There were differences in the hulls of the two vehicles, but Larson testified on cross-examination that no more than ten percent of the component parts of the two were different. It was testified that the Americans were able to assist the Portuguese in constructing the Chamite by a process of "reverse engineering." This consisted of removing and studying parts from the prototype Commando which had been brought to Portugal from West Germany by way of Spain.

There was testimony that Van Hee was in Portugal on at least two occasions during the time the Americans whom he and Lar-

son had recruited were working there. When some of the Americans became dissatisfied with the payments they were receiving from the Portuguese company which was working on the Chamite, it was testified that Van Hee met with Botto to settle the difficulty.

The United States Munitions List was set forth in 22 C.F.R. § 121.01. Armored amphibious military type vehicles were included in Category VII of the List. Included in Category XVIII of the List was "[t]echnical data relating to the articles described in this subchapter as arms, ammunition, and implements of war . . . ." The government introduced evidence that no license for the exportation of technical data relating to the Commando was issued to Van Hee, Larson or the Michigan manufacturer during the time that the conspiracy was charged. The prosecution was grounded on the theory that the blueprints of the vehicle and its parts and the technical knowledge of the Americans who worked on the Chamite in Portugal were "technical data" within the meaning of the Act and regulations. The defendant contended that neither the blueprints nor the technical knowledge of the Americans who worked on the Chamite in Portugal was technical data. He further argued that the movement of the prototype Commando from West Germany to Spain and thence to Portugal did not violate any law relating to export of implements of war and that the alleged reverse engineering process was not a source of technical data.

Two issues are presented on appeal. The first incorporates the defendant's contentions in the district court and is stated in the brief as follows:

Since the act which appellant allegedly conspired to commit was not unlawful and having been accomplished was not accomplished in an unlawful manner, appellant may not be convicted of conspiracy to commit that act. (Appellant Brief, p. 29).

This statement is based on the supposition that nothing which was taken to Portugal and used there in manufacturing the Chamite vehicle was technical data within the regulations. It is argued that a conspiracy is by definition an agreement to commit an illegal act and that neither the particular activities of Van Hee and the other two indicted co-conspirators nor their ultimate goal of contributing to the manufacture of Chamite vehicles in Portugal was illegal.

In 22 U.S.C. § 1934 the President was given authority to control the export of arms, ammunition and implements of war "in furtherance of world peace and the security and foreign policy of the United States, . . . ."

The requirement of an export license was contained in 22 C.F.R. § 123.02 of the 1966 regulations:

Section 123.02. Export license.

Articles on the U.S. Munitions List may not be exported from the United States until a license has been issued, or unless covered by an exemption provision of this subchapter. Prior to the issuance of an export license, the Department of State may also require documentary information pertinent to the proposed transaction.

Violations were treated in 22 C.F.R. § 126.-01:

Section 126.01. Violations in general.

It shall be unlawful for any person to export or attempt to export from the United States any of those articles designated by the U.S. Munitions List or to import or attempt to import such articles into the United States without first having obtained a license therefor, unless written approval was obtained from the Department of State or an exemption from this requirement is authorized by this subchapter.

It is not claimed by the government that the alleged conspiracy involved the actual export of Commando vehicles to Portugal after the earlier license had been revoked. However, Congress subjected "technical data relating thereto" to the same control as the arms and implements themselves. This was doubtless done in recognition of the fact that world peace and American security and foreign policy could be threat-

ened by the exportation of such data without the necessity of actually sending arms or implements abroad. The definition of "technical data" appeared at 22 C.F.R. § 125.01 in the 1966 regulations:

Section 125.01. Technical data.

The term "technical data" as used in Category XVIII of the U.S. Munitions List means any professional, scientific, or technical information relating to arms, ammunition, and implements of war which includes any model, design, photographic print or negative, plan, specification, or drawing, engineering performance characteristics data, or similar information which could enable the recipient to use, produce, operate, maintain, repair, or overhaul the article to which these data relate (see also § 125.20).

Technical data, by this definition, is nothing more than information of a particular kind. The language used is quite inclusive—"any professional, scientific, or technical information relating to arms, ammunition, and implements of war . . . ." Though several common forms of recording and preserving this type information, such as models, prints and specifications are listed, the definition again employs extremely broad language by including " . . . similar information which could enable the recipient to use, produce, operate, maintain, repair, or overhaul the article to which these data relate."

Van Hee concedes that the Commando vehicle was included within the designation of arms, ammunition, and implements of war in Category VII of the Munitions List. However, he argues that the Commando is unique among armored amphibious vehicles in that many of its component parts are "off the shelf items." He contends that these parts are available to the public and that information relating to them, including blueprints, was exempted from the requirement of an export license by 22 C.F.R. § 125.30(a)(1), which provided as follows:

Section 125.30. General exemptions.

(a) Collectors of customs or postal authorities may permit the exportation, without a license, to any destination, oth-

er than those listed in § 125.42, of unclassified technical data as follows:

(1) If it is in published form and subject to public dissemination by being:

(i) Sold at newsstands and bookstores;

(ii) Available by subscription or purchase without restrictions to any person or available without cost to any person;

(iii) Granted second class mailing privileges by the U.S. Government;

(iv) Freely available at public libraries.

■■■ The blueprints were identified by witnesses as being used in construction of the plywood mock-up and the Chamite in Portugal. They were clearly technical data within the definition of Section 125.01. The exemption provision of the regulations is not self-executing. It may only be claimed if the certification requirements contained in 22 C.F.R. § 125.40 are met:

Section 125.40. Certification requirements.

If the exporter wishes to claim the benefit of an exemption from the requirement of an individual license in accordance with the provisions of § 125.30, he is required to certify that the proposed exportation is covered by one of the provisions of that section. He shall so certify by marking the package or letter "22 CFR 125.30 * * * applicable," identifying the specific subsection or subsections under which the exemption is claimed.

The only evidence on the subject is to the effect that the blueprints were packaged as ordinary cargo and taken with personal luggage to Portugal. The claim that the blueprints were exempt comes too late. If the exemption did apply to the blueprints it clearly was necessary that it be asserted and the requirements of Section 125.40 satisfied at the time the blueprints were taken out of the United States.

■■■ The government also contends that the technical knowledge of the "team" members constituted technical data. Van Hee discusses the past duties in connection with design and manufacture of the Commando of each of the Americans who worked on the Chamite project in Portugal

in an effort to demonstrate that none of them possessed technical or scientific knowledge which would properly be included in the definition of technical data. He argues that there was no proof that their knowledge relating to the Commando consisted of anything other than widely published and generally understood information. This appears to be an argument that such knowledge was exempt under Section 125.30(a)(1). Reliance on the exemption provision is foreclosed as in the case of the blueprints by the complete lack of any evidence that Van Hee or any of his associates sought to claim the exemption under Section 125.40. Even if the exemption had been claimed, it is difficult to understand how it could be applied to this type information. The exemption obviously refers only to unclassified technical data *in published form*. The evidence showed that the contributions of these individuals to the Chamite project consisted of knowledge in the form of experience and "know-how" as well as familiarity with widely distributed technical publications. We agree with the District Judge that the term "technical data" as used in the regulations included the technical knowledge of the men who traveled to Portugal for the purpose of assisting in the production of Commando-type vehicles. *See United States v. Donas-Botto,* 363 F.Supp. 191 (E.D.Mich.1973).

Van Hee argues that since the prototype Commando was exported from the United States to West Germany pursuant to a permit and was legally shipped to Portugal thereafter, its employment in reverse engineering did not violate the Act or regulations. We need not decide whether the shipment of this vehicle to Portugal and its use there, either by way of reverse engineering or otherwise, would support a conviction for the substantive offense of violating 22 U.S.C. § 1934. However, evidence that this vehicle was used in Portugal by the very persons recruited for the Chamite project in combination with illegally exported technical data in furtherance of the alleged agreement to violate Section 1934 was competent to support the conspiracy charge. Every act of the conspirators taken to effect the illegal purpose of the conspiracy need not be illegal in itself. As the Supreme Court stated in *Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 707, 82 S.Ct. 1404, 1414, 8 L.Ed.2d 777, 788 (1962), " . . . it is well settled that acts which are in themselves legal lose that character when they become constituent elements of an unlawful scheme." (citations omitted.)

The appellant presents as his second issue the claim that the evidence introduced at the trial was at least as consistent with a reasonable hypothesis of innocence as that of guilt of a conspiracy to violate 22 U.S.C. § 1934. In *United States v. Saunders,* 325 F.2d 840, 843 (6th Cir. 1964), *cert. denied,* 379 U.S. 978, 85 S.Ct. 677, 13 L.Ed.2d 568 (1965), the court stated that "[e]vidence that at most establishes no more than a choice of reasonable probabilities cannot be said to be sufficiently substantial to sustain a criminal conviction upon appeal." For a more recent application of this principle see *United States v. Leon,* 534 F.2d 667 (6th Cir. 1976).

In testing the sufficiency of the evidence where a jury has returned a guilty verdict we are required to view the evidence in the light most favorable to the government. *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). The defendant was not indicted for, or convicted of the substantive offense of violating Section 1934. However, " . . . a conspiracy to commit a crime is a different offense from the crime that is the object of the conspiracy." *United States v. Rabinowich,* 238 U.S. 78, 85, 35 S.Ct. 682, 683, 59 L.Ed. 1211, 1214 (1915). The essence of a conspiracy is an agreement. The government did not produce direct evidence of an agreement among the indicted parties to violate the statute. Nevertheless the record does contain evidence of activities by the three men from which an inference could reasonably be drawn that they had agreed to a plan by which a Commando-type vehicle would be manufactured in Portugal. The testimony of Erickson, Jordan

and Decker, three of the Americans who worked on the Chamite project in Portugal, directly implicated both Van Hee and Larson in the formulation and execution of the project. Though testimony of the witness Henke, a former employee of the Michigan manufacturer of the Commando, was contradictory at times, he did state that Van Hee had told him in substance that

> . . . he sent these people over to Portugal to build an armored car in Portugal rather than be competitive in the United States. In other words, they're going to build an armored car.

There is no dispute that Van Hee knew that the license to export American manufactured vehicles had been cancelled or that he was involved in recruiting the team of technicians who went to Portugal. The evidence of Van Hee's contacts with Larson and Botto in connection with the Portuguese operation could be found to support a finding that there was an agreement among the three.

■ To support his argument that the evidence established no more than an equipoise Van Hee argues that the Portuguese operation was carried out openly and without stealth. He points to the fact that on one occasion several of the team members went to the American Embassy in Lisbon to complain about treatment they were receiving from their Portuguese employer. This episode was established by the evidence, but it was clear that no one informed any embassy official of the details of the Chamite operation. The defendant also points to the fact that a license was obtained from the State Department before the prototype Commando was sent from West Germany to Spain and that there were no restrictions as to its ultimate destination. Nevertheless, there was evidence that Van Hee represented the prototype as having only scrap or junk value before it left Germany, whereas it was in operational condition when it arrived in Portugal. The evidence thus adverted to, together with testimony of the commonplace nature of the Commando's components, presented an explanation of the activities of Van Hee and the indicted

co-conspirators involving no illegality. This theory was skillfully argued to the jury. However, the established rule of this circuit is that a finding of guilt may be based on circumstantial evidence which does not "remove every reasonable hypothesis except that of guilt." *United States v. Dye,* 508 F.2d 1226, 1231 (6th Cir. 1974), *cert. denied,* 420 U.S. 974, 95 S.Ct. 1395, 43 L.Ed.2d 653 (1975); *United States v. Scales,* 464 F.2d 371, 373 (6th Cir. 1972).

■ The jury was fully instructed on the requirements for a conviction of conspiracy. There were no objections to the jury charge, nor were any requests by the defendant for particular instructions denied. Most often a criminal conspiracy is established by evidence of actions and words from which an agreement to violate the law is inferred, rather than by direct evidence. *United States v. Levinson,* 405 F.2d 971, 986 (6th Cir. 1968), *cert. denied,* 395 U.S. 958, 89 S.Ct. 2097, 23 L.Ed.2d 744 (1969). We hold that the evidence in the record is sufficient to support the jury's verdict finding the defendant guilty of conspiring to export technical data from the United States to Portugal in violation of 22 U.S.C. § 1934.

The judgment of the district court is affirmed.