UNITED STATES of America, Appellee,

v.

EDLER INDUSTRIES, INCORPORATED, a corporation and Vernon Edler, an Individual, Appellants.

No. 76–3370.

United States Court of Appeals, Ninth Circuit.

July 31, 1978.

---

**518**

James L. McDonald (argued), of Hunt, Liljestrom & Wentworth, Santa Ana, Cal., for appellants.

Ted Wai Wu, Asst. U.S. Atty., (argued), of Los angeles, Cal., for appellee.

Before ELY and GOODWIN, Circuit Judges, and SOLOMON,* District Judge.

ELY, Circuit Judge:

Edler Industries, Incorporated, and Vernon Edler appeal from their convictions for exporting, without a license, technical data relating to articles on the United States Munitions List. 22 U.S.C. § 1934 (1970) (repealed 1976); see note 1 infra. Edler Industries was sentenced to pay a fine of $25,000. Vernon Edler received a two-year sentence, suspended on the condition that he serve ten weekends in a jail-type institution, remain on probation for five years, and donate 1200 hours of work to a charitable organization.

I.

Most of the facts are not seriously disputed. About 1950 Edler Industries began in Newport Beach, California, as a small machine shop and gradually evolved into a manufacturing and engineering firm in the aerospace industry. Vernon Edler, the founder and president of the corporation, guided the business affairs of the firm and had frequent contacts with its engineers and technicians. The corporation acquired expertise in tape wrappings, a process for creating durable lightweight materials by wrapping specially impregnated cloth around a form, further impregnating it with other materials, and curing it under pressure and heat. It also developed a capacity to produce carbon/carbon composites through application of some of the same techniques. Both types of materials have important applications for rocket and missile components, particularly in nozzles. Their light weight is valuable, and they are ablative, wearing away under the pressure and heat of the rocket exhaust at a predictable rate. Edler Industries worked on the Polaris and other government missile programs; consequently, its officers and employees were familiar with missile components.

The techniques utilized by Edler Industries do not constitute classified information, and they have various civilian uses. Carbon/carbon technology is, for example, utilized in the manufacture of golf club shafts.

French missile companies eager to master this technology first contacted Edler Industries in 1968. Edler and the Societe d'Etude de la Propulsion par Reaction negotiated an agreement for a technical assistance program. Edler then sought approval from the Office of Munition Control of the State Department (OMC). OMC denied the request, but Edler nevertheless continued to provide assistance.

In January 1974 Edler Industries reached an agreement with a second French firm, the Société Europeene de Propulsion (SEP), for the provision of technical assistance and data related to a tape wrapping program. In March 1974 Edler executed a similar agreement with SEP for carbon/carbon materials. SEP engineers visited Edler's Newport Beach plant, and Edler employees toured SEP's missile and rocket plant in Bordeaux. Edler filed applications with OMC for licenses covering the two programs, stating that the agreements would not become effective without OMC approval. OMC again rejected the requests in October 1974 on the basis that the exportation of this particular technical knowledge contravened United States policy. Edler, despite its prior representation, began im-

---

* Honorable Gus J. Solomon, Senior District Judge for the District of Oregon, sitting by designation.

plementing the programs shortly after the execution of the agreements. By the time OMC issued its disapproval, the tape wrapping program was completed, and, in spite of OMC's action, Edler continued to fulfill its carbon/carbon agreement.

Employees of Edler Industries demonstrated to SEP the techniques they used and experimented with the application of those techniques to the different materials used by SEP in France. They observed and commented on the techniques employed by SEP. They produced sample pieces in configurations similar to those utilized in missiles but not specifically designed for any particular missile. SEP was engaged in the production of rockets, a fact known to Edler personnel. Only on one minor occasion was there any indication that SEP might use the information supplied by Edler for nonmilitary purposes. The witnesses at trial generally agreed that the technology furnished by Edler had direct missile applications.

## II.

The Mutual Security Act of 1954 authorizes the President to control the "export and import of arms, ammunition, and implements of war, including technical data relating thereto." 22 U.S.C. § 1934(a) (1970).[1] The President is expressly empowered to designate which articles, including relevant technical data, constitute arms, ammunition, and implements of war. *Id.* Pursuant to this statute the Department of State has promulgated regulations to restrict the international traffic in arms. *See* 22 C.F.R. §§ 121–130 (1977). One of the regulatory requirements is that an exporter of arms first obtain a license for exportation from the State Department. *Id.* §§ 123.01, 125.04, 125.05.

22 C.F.R. § 125.01 (1977) provides a three-part definition for the term "technical data." The only portion that is relevant here provides:

"[T]echnical data" means: (a) Any unclassified information that can be used, or be adapted for use, in the design, production, manufacture, repair, overhaul, processing, engineering, development, operation, maintenance, or reconstruction of arms, ammunition, and implements of war on the U.S. Munitions List . . . ..

Invoking the First Amendment, appellants emphasize the great potential breadth of the definition. The basic principles of the diesel engine, for example, constitute unclassified information that can be used in the manufacture of military trucks, which are included in category VII(d) of the U.S. Munitions List. *Id.* § 121.01.

Export controls regulate the transmission of unclassified information by mail, hand carriage, participation in foreign symposia, and domestic plant visits. *Id.* § 125.03. An exemption to the license requirement exists for published unclassified technical data, provided the exporter follows prescribed procedures. The person seeking publication, however, has the burden of obtaining governmental approval prior to publication. *Id.* § 125.11(a)(1) n. 3; *see United States v. Van Hee*, 531 F.2d 352, 356 (6th Cir. 1976). In the context of the regulatory framework, an expansive interpretation of technical data relating to items on the Munitions List could seriously impede scientific research and publishing and the international scientific exchange.

## III.

The First Amendment protects at least some transmissions of information in a com-

---

1. In full, section 1934(a) provides:

The President is authorized to control, in furtherance of world peace and the security and foreign policy of the United States, the export and import of arms, ammunition, and implements of war, including technical data relating thereto, other than by a United States Government agency. The President is authorized to designate those articles which shall be considered as arms, ammunition, and

implements of war, including technical data relating thereto, for the purposes of this section.

In 1976 Congress repealed section 1934, replacing it with 22 U.S.C. § 2778 (1976) (enacted as Act of June 30, 1976, Pub.L. No. 94–329, § 212(b)(1), 90 Stat. 745). Section 1934 was therefore in effect when Edler Industries and SEP made the agreement in question.

mercial context. *See Bates v. State Bar,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977); *Virginia State Bd. of Pharmacy v. Virginia Citizens Council, Inc.,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976); *Bigelow v. Virginia,* 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975); *Pittsburg Press Co. v. Pittsburg Comm'n on Human Rights,* 413 U.S. 376, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973). The contours of freedom of speech in the commercial realm are highly unsettled. *See, e. g.,* Meiklejohn, *Commercial Speech and the First Amendment,* 13 Cal. W.L.Rev. 430 (1977); Rotunda, *Commercial Speech Doctrine in the Supreme Court,* 1976 U.Ill.L.F. 1080; Schiro, *Commercial Speech: The Demise of a Chimera,* 1976 Sup.Ct.Rev. 45; Comment, *The Constitutional Status of Commercial Expression,* 3 Hastings Const. L.Q. 761 (1976); Note, 11 Ga.L.Rev. 230 (1976). Edler has advanced a colorable claim that the First Amendment furnishes a degree of protection for its dissemination of technological information. We deem it unnecessary in this case to resolve the precise scope of that protection. Assuming the full applicability of the First Amendment, invalidation of the federal controls on munitions is unwarranted because of the narrow statutory construction that we adopt.

Recognition that Edler may have constitutionally protected expression does not by itself define the extent of that protection. By regulating conduct, the Government may pursue its legitimate objectives even though incidental limitations upon expression may result.

> [G]eneral regulatory statutes, not intended to control the content of speech but incidentally limiting its unfettered exercise, have not been regarded as the type of law the First or Fourteenth Amendment forbade Congress or the States to pass, when they have been found justified by subordinating valid governmental interests, a prerequisite to constitutionality which has necessarily involved a weighing of the governmental interest involved.

*Konigsberg v. State Bar,* 366 U.S. 36, 50–51, 81 S.Ct. 997, 1007, 6 L.Ed.2d 105 (1961).

The federal government undeniably possesses the power to regulate the international arms traffic. The President, under section 1934, has the authority to act for the United States in this respect. As a necessary incident to the power to control arms export, the President is empowered to control the flow of information concerning the production and use of arms. The authority to regulate arms traffic would be of negligible practical value if it encompassed only the exportation of particular military equipment but not the exportation of blueprints specifying the construction of the very same equipment.

A · strict test applies when legislation, though directed toward the regulation of conduct, also restricts expression. Whenever government regulation impinges upon freedom of speech, "the power to regulate must be so exercised as not, in attaining a permissible end, unduly to infringe the protected freedom." *Cantwell v. Connecticut,* 310 U.S. 296, 304, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940); *see United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). It is for this reason that, when reviewing alleged First Amendment violations, courts have refused to countenance overly broad statutes. *See, e. g., Gooding v. Wilson,* 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972); *Keyishian v. Board of Regents,* 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967).

As we have indicated, section 1934 and the definition of technical data are susceptible of an overbroad interpretation. Their expansive language may be construed to restrict not only the export of arms and information directly leading to the production of articles on the Munitions List, but also the interchange of scientific and technical information that of itself is without any substantial military application. A broad statutory reading, however, is neither necessary nor proper. In our opinion, technical data must relate in a significant fashion to some item on the Munitions List. Moreover, adequate notice to the potential exporter requires that the relationship be clear. The Senate Committee on Foreign

Relations described section 1934 as allowing control of munitions, "including relevant technical data." S.Rep.No. 1799, 83d Cong., 2d Sess. ——, *reprinted in* [1954] U.S.Code Cong. & Admin.News, pp. 3175, 3244. Presumably, Congress intended that the technical data subject to control would be directly relevant to the production of a specified article on the Munitions List, not simply vaguely useful for the manufacture of arms.

A careful reading of the regulations also suggests that the broad definition of technical data contained in 22 C.F.R. § 125.01 is not to be taken literally. The exemptions from licensing listed in 22 C.F.R. § 125.11 (1977) are specific, referring to items such as training manuals, firearms of less than .50 caliber, and editorial revisions of technical data previously approved for export.

In addition, we note that the successor statute to the Mutual Security Act of 1954 evinces a congressional intent to delineate narrowly the scope of information subject to arms controls. The replacement for section 1934, 22 U.S.C. § 2778 (1976), provides for presidential control of "defense articles and defense services." *Id.* § 2778(a)(1). Although the President retains the authority to designate what information constitutes defense services for the purpose of section 2778, *id.* §§ 2778(a)(1), 2794(7), the act supplies a fairly narrow definition of defense services for the remaining provisions. Under 22 U.S.C. § 2794(4) (1976) defense services include technical assistance and "defense information . . . used for the purposes of making military sales." The term "defense information" refers in part to items such as documents, plans, or prototypes that relate to specified defense articles. *Id.* § 2403(e).

The sole appellate case dealing with technical data under section 1934 lends some support to our narrow interpretation of the term. In *United States v. Van Hee*, 531 F.2d 352 (6th Cir. 1976), the defendant exported information to Portugal for the production of an armored amphibious military vehicle essentially identical to one manufactured in the United States. The Department of State had denied an export license for the vehicle. The Sixth Circuit held that the exported information, which consisted of blueprints and the technical expertise of Americans who travelled to Portugal, constituted technical data for which an export license was required. *Id.* at 356–57. While noting the broad regulatory definition of technical data, the court emphasized the close connection between the data and the amphibious vehicle, an article designated in the Munitions List. *Id.* at 356.

We conclude, therefore, that section 1934 and the accompanying regulations prohibits only the exportation of technical data significantly and directly related to specific articles on the Munitions List. The prohibition includes the provision of technical assistance for the foreign manufacture of articles that, if manufactured domestically, would be on the Munitions List. If the information could have both peaceful and military applications, as Edler contends that its technology does, the defendant must know or have reason to know that its information is intended for the prohibited use. *Cf. Gorin v. United States*, 312 U.S. 19, 27–28, 61 S.Ct. 429, 85 L.Ed. 488 (1941) (*scienter* requirement shelters Espionage Act, ch. 30, §§ 1, 2, 40 Stat. 217 (1917) (current version at 18 U.S.C. § 793 (1976)), from impermissible vagueness). These limitations are necessary both to adhere to the purpose of the Act and to avoid serious interference with the interchange of scientific and technological information.

As construed, section 1934 and the regulations do not interfere with constitutionally protected speech. Rather, they control the conduct of assisting foreign enterprises to obtain military equipment and related technical expertise. So confined, the statute and regulations are not overbroad. For the same reasons the licensing provisions of the Act are not an unconstitutional prior restraint on speech.

One additional First Amendment argument is presented. This is that the Government may not constitutionally pro-

hibit the exportation of Edler's technology because that technology is widely distributed in the United States. The District Court properly rejected Edler's position. Given the unquestionable legitimacy of the national interest in restricting the dissemination of military information, the claim of public availability in the United States is not a defense recognized by the Constitution. *Cf. Zemel v. Rusk,* 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965) (Government may prevent person from travelling to particular country). The State Department regulations, we should note, do grant a public availability defense, subject to certain conditions. Technical data is exempt from the export license requirements if it is both published and available to the general public. 22 C.F.R. § 125.11(a) (1977). To claim such an exemption an exporter must comply with the certification standards contained in 22 C.F.R. § 125.22 (1977). *See United States v. Van Hee, supra,* 531 F.2d at 356.

 While, under the facts present here, the trial court correctly refused to recognize appellants' public availability defense, the court did not have the benefit of our interpretation of technical data. It rejected a second defense raised at trial by both appellants, which was that the information furnished by Edler Industries had a number of nonmilitary uses. We believe evidence concerning nonmilitary applications is relevant to the question of *scienter, i. e.,* whether a defendant knew or should have known that the recipient of the exported information would use the information to produce or operate Munitions List articles.

The District Court also refused to permit the defense to develop the proposition that the assistance given to SEP would not, of itself, suffice for the manufacture of rocket nozzle components. Any information that would in any way help in a process that led to the final product, the court stated, came

under the definition of technical data. Such a reading of the statute and regulations is far too broad, as such evidence bears on the significance of the relationship between information and Munitions List items.

 Accordingly, because the case was tried on an incorrect interpretation of the scope of section 1934 and the pertinent regulations, the judgments of conviction are reversed and the cause is remanded for a new trial consistent with this opinion.[2]

REVERSED AND REMANDED.

---

**2.** The procedural due process claims raised by Edler are without merit. The notice of disapproval from OMC was not arbitrary, but was founded on a policy of only selling missile equipment and keeping missile technology in the United States. Moreover, Edler Industries

did not seek administrative review under 22 C.F.R. § 123.05(c) (1977) or a hardship exception under 22 C.F.R. § 126.10 (1977), nor did it seek judicial review under the Administrative Procedure Act, 5 U.S.C. § 702 (1976).