818 F.2d 867
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Charles BANUSH, Defendant-Appellant.
 No. 86-1569.
 United States Court of Appeals, Sixth Circuit.
 May 13, 1987.
 
 Before MARTIN and MILBURN, Circuit Judges, and ALDRICH, District Judge.*
 PER CURIAM.
 
 
 1
 Defendant Charles Banush appeals from his conviction on one count of maliciously damaging or destroying a building used in or affecting interstate commerce by means or use of fire in violation of 18 U.S.C. Sec. 844(i). For the reasons that follow, we affirm.
 
 I.
 
 2
 Defendant Banush and his cousin, Fadil Duro, were owners of the Gaslight Room restaurant in downtown Detroit, Michigan. The decline of the downtown area where the restaurant was located caused the business to suffer in terms of profitability.
 
 
 3
 On May 23, 1983, Banush was working at the restaurant with his wife, two daughters, waitress Nancy Clig, and bartender Ernest Medina. At approximately 9:15 p.m., Medina checked the restrooms, locked the doors, and left the building accompanied by Clig. At 9:25 p.m., Banush's wife and daughters went home. Banush remained, socializing with a few remaining customers.[1]
 
 
 4
 At 9:30 p.m., Banush let the last customer out of the building through a side door and checked it to make sure that it was locked. He then went into his office, got his coat, and left the office, closing the door behind him. At 9:35 p.m., Banush set the burglar alarm, shut off the lights, and exited through the kitchen door that he locked behind him.
 
 
 5
 At 9:51 p.m., firemen responded to a call reporting that the Gaslight Room was on fire. Fireman Sheehan testified that the building was securely locked and that firemen were forced to use axes to gain entry into the building. Sheehan's testimony was corroborated by that of fire investigator Thomas Mathis.
 
 
 6
 Banush returned to the restaurant at approximately 10:25 p.m., having learned of the fire upon his arrival at his home. He spoke briefly with Mathis about his normal closing routine and granted permission to Mathis for an investigation into the origin of the fire. He stated that he knew of no gas or electrical problems. Banush also told Mathis that the only flammable in the building was a small can of paint thinner. Two days later, Banush told Agent Welch that no flammables were stored in the building.
 
 
 7
 Ronald Connell, a police sergeant assigned to the Police Fire Arson Unit, made a visual inspection of the premises on the night of the fire. He immediately noted what he believed were two separate areas of intense burning. Other members of the unit concurred with his initial conclusion that two separate fires had been set in the building.
 
 
 8
 Connell initially concentrated his investigation in an area near the piano bar. He collected a carpet sample to be tested for flammable liquids. However, he noted no unusual odor in that area.
 
 
 9
 On the opposite side of the restaurant, Connell discovered an area of intense burning at the base of a support column. The debris in that area contained a strong odor that burned Connell's eyes and nose. He testified that the odor "actually made [him] feel light headed."
 
 
 10
 The primary areas of investigation were clean. Banush informed Connell that no wastebaskets were kept in the areas. Connell subsequently examined the electrical wiring and concluded that it was not the source of the fire. At that point, the initial investigation was terminated.
 
 
 11
 Connell returned to the fire scene on the morning of May 25, 1983, with Agent Welch, Sergeant Plouman, and Lieutenant Beauregard. The officers met Mr. Banush at the scene, after requesting his presence in a telephone conversation. Connell again requested and received permission to continue the search.
 
 
 12
 The officers again concentrated their investigation in the area of the piano bar. They found a flammable burn pattern on the floor in that area. They also took a sample of the carpeting from the piano bar.
 
 
 13
 Connell conducted a more thorough search in the area that he described as the source of the second fire, on the west side of a partition between the two restaurant areas. Again, the officers examined the debris to floor level and took another carpet sample in the area in which Connell had found the odor that made him light-headed on the night of the fire.
 
 
 14
 The officers isolated a third area of what Connell described as "suspicious burning" at floor level near the base of two swinging doors. Connell testified that "there was no reason for this fire to have occurred as a result of an accidental fire, gave the impression of being a flammable spill or pour in that particular area. The burning emanating from the floor level upward."
 
 
 15
 At some point, Connell was not sure precisely when, Agent Welch advised Mr. Banush that the investigators were convinced the fire had been started intentionally. Connell testified that Banush reacted by saying the fire could not have been deliberately set because he was the last one out of the building. He appeared to be somewhat agitated. Connell testified that the officers told him they were not particularly accusing him, but that they did believe the fire had been deliberately set.
 
 
 16
 Connell then testified that the three areas he had described, the piano bar, the area underneath the swinging doors, and the area on the west side of the partition, could be described as three separate areas of origination for three separate fires.[2] On the basis of this conclusion, the investigators determined that the fire was incendiary in origin. Connell also indicated that a flammable liquid had been poured on these areas in order to start the fire. This conclusion was based in part on a pattern of low burning along a baseboard, indicating that a flammable material was introduced in that particular area.
 
 
 17
 Connell also testified that, as he was completing his investigation, he overheard Banush tell conflicting stories regarding the existence of business records. He heard Banush explain to Mrs. Eastman, the woman from whom he had purchased the restaurant, that the records were destroyed in the fire. Another time, Banush stated that some of the records were in the kitchen. Banush told Agent Welch that the records were confidential and that he would not provide access to them until he consulted his attorney.
 
 
 18
 On another occasion, around June 6, 1983, Connell called Banush and asked him for the address of one of the employees that he wanted to interview. Banush replied that he would have to check his records, which were at his home in Dearborn. On the basis of these conflicting statements, Connell requested and received a search warrant for Banush's home. The warrant was executed on the following day.
 
 
 19
 At trial, the jury also heard testimony from Richard Tontarski, a forensic chemist. Tontarski testified that one of the debris samples taken from the restaurant contained a heavy concentration of a medium petroleum distillate such as paint thinner or charcoal lighter. The remaining samples did not contain accelerants. Tontarski explained the absence of accelerants in the remaining samples by stating that they could have been lost through evaporation, water from the fire hoses, or failure to collect the sample from the precise areas in which accelerants had been poured.
 
 
 20
 There was extensive testimony indicating that the Gaslight Room was failing, and that Banush was heavily indebted. In May 1983, Banush was a month behind on the restaurant's rent. He owed his suppliers between $17,000 and $19,000 as of April, 1983. In 1982, he had begun to pay his suppliers on a cash basis, as opposed to a credit basis, in order to retain more control over his financial affairs. Between 1982 and 1983, he was able to reduce the amount owed to suppliers by approximately $4,000.
 
 
 21
 Banush also owed a monthly electric bill of $1,000, a gas bill of $600 to $700, a steam bill of $2,000, and other small utility bills. He owed the federal government withholding taxes in the amount of $7,000 to $8,000, and local taxes in the amount of $1,500 to $1,600 were due shortly after the fire. He was often forced to forego his own salary when business was bad. Banush paid $1,000 a month on his land contract; those installments were current.
 
 
 22
 Banush owed his cousin and silent partner, Fadil Duro, approximately $46,000. Although Banush had repaid $3,000 of the loan, the installments stopped at some point in time before the fire.
 
 
 23
 Banush also owed several personal debts. He borrowed $1,000 from a friend in 1983, borrowed $5,000 from his bartender approximately two and one-half years before the fire, and had repaid only $1,000 of that loan.
 
 
 24
 Banush admitted that he had considered selling the restaurant. Although he did not have a formal listing arrangement, a real estate agent occasionally showed the premises to people who expressed an interest in buying it, and an appointment had been made for two gentlemen to look at the building on May 25, 1983, two days after it burned down. Banush was disappointed that the downtown area had declined and stated that he wished he had sold the restaurant when business was good.
 
 
 25
 Jeffrey Weiss, defendant's accountant, testified about the business' financial condition. He testified that net sales, income and worth had decreased as follows:
 
 
 26
 Date Net Sales Net Loss or Income Net Worth
---------- ----------- ------------------ ------------
Dec. 1978 $403,874.83 --$22,227.16 $31,386.03
Dec. 1979 $414,206.31 --$ 7,160.40 $23,679.74
Dec. 1980 $356,857.33 --$12,110.42 $ 5,238.86
Dec. 1981 $350,232.97 --$21,317.52 $ 6,552.34
Dec. 1982 $309,689.72 --$32,576.51 --$22,727.17
April 1983 $ 87,632.70 --$14,940.96 --$37,668.13
 
 
 27
 Ralph Johnson, an auditor for the United States Bureau of Alcohol, Tobacco and Firearms, prepared a cash-flow analysis for the business. He testified that the business paid out more cash than was taken in for the years 1978, 1979, 1982 and 1983.
 
 
 28
 At the time of the fire, the Gaslight Room was insured by Transit Casualty under a policy that provided $120,000 coverage for the loss of the building and its contents and $60,000 maximum coverage for business interruption.
 
 
 29
 Defense counsel did not move for a judgment of acquittal at any time during the course of the trial. The case went to the jury on February 11, 1986. At the end of the day, the jury foreman presented the following note to the court:
 
 
 30
 We are unable to reach an unanimous verdict at this time. There are jurors on each side of the verdict who feel sufficiently entrenched in their positions, that there is no future in continuing to deliberate. We simply cannot come to an unanimous decision. What next?
 
 
 31
 The court refused to discharge the jury and instructed them to return the next day. The jury reached a guilty verdict at the end of the day on February 12, 1986.
 
 
 32
 In this appeal, two issues are presented for review:
 
 
 33
 (1) whether defendant's conviction should be reversed on the basis of insufficient evidence, despite the fact that no motion for a judgment of acquittal was ever made;
 
 
 34
 (2) whether the district court committed plain error by allowing Banush's deposition, which had been taken for insurance purposes, to be read into the record at the criminal trial.
 
 II.
 A.
 
 35
 18 U.S.C. Sec. 844(i) provides in relevant part:
 
 
 36
 (i) Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce shall be imprisoned for not more than ten years or fined not more than $10,000, or both....
 
 
 37
 Defendant argues that the evidence against him is insufficient to support the conclusion that he had a motive to burn the building. Moreover, he contends that, although he clearly had an opportunity to set fire to the building, other persons also may have had such opportunity.
 
 
 38
 As a general rule, a criminal defendant must make a motion for judgment of acquittal in order to preserve the issue of sufficiency of the evidence for appellate review. When no such motion has been made, the conviction will be upheld in the absence of plain error or a gross miscarriage of justice. United States v. Bierley, 521 F.2d 191, 192 (6th Cir.1975); see also United States v. Faymore, 736 F.2d 328, 334 (6th Cir.) (failure to renew motion for judgment of acquittal at the close of all the evidence precludes review of sufficiency absent manifest miscarriage of justice), cert. denied, 469 U.S. 868 (1984); United States v. Van Dyke, 605 F.2d 220, 225 (6th Cir.), cert. denied, 444 U.S. 994 (1979).
 
 
 39
 Although the evidence supporting defendant's conviction is circumstantial, evidence of this nature has long been considered sufficient to support a conviction. See, e.g., United States v. Stone, 748 F.2d 361, 363 (6th Cir.1984). Moreover, "it is not necessary that such evidence remove every reasonable hypothesis except that of guilt." United States v. Prieur, 429 F.2d 1237, 1238 (6th Cir.1970) (per curiam); see Stone, 748 F.2d at 363; United States v. Van Hee, 531 F.2d 352, 358 (6th Cir.1976).
 
 
 40
 Our review of the record in light of the standards set forth above indicates that no miscarriage of justice will occur if defendant's conviction is upheld. Accordingly, his challenge to the sufficiency of the evidence must fail.
 
 B.
 
 41
 Defendant also argues that the district court committed reversible error by allowing a deposition taken for insurance purposes to be read into the record at trial. Although defense counsel made an oral motion in limine before the deposition was read, he withdrew it on the condition that certain prejudicial comments made by defendant's attorney be deleted.
 
 
 42
 In the absence of plain error, a party may not challenge the introduction of evidence when no timely objection was made in the trial court. Helminski v. Ayerst Laboratories, 766 F.2d 208, 211 (6th Cir.), cert. denied, 106 S.Ct. 386 (1985); Kokesh v. American Steamship Co., 747 F.2d 1092, 1094-95 (6th Cir.1984). "[T]he plain error exception to the contemporaneous objection rule is to be 'used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.' " United States v. Young, 105 S.Ct. 1038, 1047 (1985) (quoting United States v. Frady, 456 U.S. 152, 163 n. 14 (1982)). See United States v. Mendez-Ortiz, 810 F.2d 76, 78 (6th Cir.1986), cert. denied, 107 S.Ct. 1384 (1987); United States v. Hook, 781 F.2d 1166, 1172 (6th Cir.), cert. denied, 107 S.Ct. 269 (1986).
 
 
 43
 [F]ederal courts have consistently interpreted the plain error doctrine as requiring an appellate court to find that the claimed error not only seriously affected "substantial rights," but that it had an unfair prejudicial impact on the jury's deliberations. Only then would the court be able to conclude that the error undermined the fairness of the trial and contributed to a miscarriage of justice.
 
 
 44
 Young, 105 S.Ct. at 1047 n. 14. See also Helminski, 766 F.2d at 211. Even if we were to assume that the district court committed error[3] by allowing the deposition to be read to the jury, there is no indication that the error "undermine[d] the fundamental fairness of the trial." Young, 105 S.Ct. at 1047.
 
 
 45
 Although the deposition contained testimony indicating that a $5,000 judgment had been entered against the defendant in the course of another business arrangement, the testimony was elicited in an attempt to determine defendant's financial condition. The record is replete with evidence indicating that defendant and his business were experiencing financial difficulty. Under circumstances such as these, when the challenged evidence is cumulative, courts have been hesitant to find that prejudice resulted from the admission of the additional evidence. See Saltzman v. Fullerton Metals Co., 661 F.2d 647, 651-52 (7th Cir.1981); Coughlin v. Capitol Cement Co., 571 F.2d 290, 306-07 (5th Cir.1978); Moran v. H.W.S. Lumber Co., 538 F.2d 238, 243 (9th Cir.1976). Similarly, the deposition testimony indicating that defendant was under investigation for arson is merely cumulative. The government's entire case rested upon the theory that defendant had burned his failing business to collect the insurance proceeds.
 
 
 46
 The court is unable to conceive of any possible rationale to support defendant's argument that he was prejudiced by admission of that part of the deposition in which he denied setting fire to the building. Accordingly, his evidentiary challenge to this statement must fail.
 
 
 47
 Finally, defendant argues that he was prejudiced by that portion of the deposition testimony indicating that he had previously filed two insurance claims on behalf of the Gaslight Room. The first claim was made after a break-in and theft of liquor. The second was made after a painting was stolen from the restaurant. No attempt was ever made to show that these claims were fraudulent. Thus, we are unable to ascertain any basis for the conclusion that this testimony was prejudicial.
 
 
 48
 Our review of the challenged portions of the deposition testimony in light of the record as a whole reveals that the error, if any, committed by the district court did not result in a miscarriage of justice. Thus, defendant's evidentiary challenges do not support the conclusion that his conviction must be overturned.
 
 III.
 
 49
 For the foregoing reasons, the judgment of the district court is AFFIRMED.
 
 
 
 *
 Honorable Ann Aldrich, United States District Judge, Northern District of Ohio, sitting by designation
 
 
 [1]
 Medina testified that he was usually responsible for closing the business at the end of the day. However, it was not particularly unusual for Banush to assume this responsibility when he stayed late to socialize with customers
 
 
 [2]
 Defendant attempts to argue that there is an inconsistency in Connell's statement because he initially indicated that there were only two fires, but then stated that three fires were set. No such inconsistency exists. The investigators believed that two fires existed when they conducted their first, cursory inspection. During the more detailed inspection conducted on May 25, 1983, they were able to isolate a third area that appeared to be the origin of a third fire
 
 
 [3]
 The specific grounds of objection raised on appeal are that the admission of the testimony violated Fed.R.Evid. 404(b) and 403. Under Rule 404(b), evidence of prior bad acts "is not admissible to prove the character of a person in order to show that he acted in conformity therewith." Under Rule 403, evidence should not be admitted if its probative value "is substantially outweighed by the danger of unfair prejudice."